# EXHIBIT 2

**IN THE CIRCUIT COURT OF TENNESSEE**
**FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS**

KELSEY WOLF, *Individually and on*
*Behalf of All Others Similarly Situated*,

      **Plaintiff,**

      **v.**

MID-AMERICA APARTMENT
COMMUNITIES, INC.,

      **Defendant.**

**CLASS ACTION**
**Cause No. _____**

**JURY DEMANDED**

---

### VERIFIED CLASS ACTION COMPLAINT FOR DAMAGES

---

Plaintiff Kelsey Wolf, brings this Class Action Complaint individually and on behalf of all others Similarly Situated in the State of Tennessee, to challenge Defendant Mid-America Apartment Communities' Inc.'s (hereinafter "Defendant" or "Defendant MAA") actions that artificially inflate the prices of multifamily residential real estate leases in the State of Tennessee above competitive levels. Defendant MAA (Lessor) carried out its price fixing scheme with other unnamed co-conspirators in violation of Tennessee Antitrust laws. Plaintiff, through her own knowledge and experience, the investigation of counsel, alleges as follows:

### NATURE OF THE CASE

1. Until approximately 2016 and potentially earlier, most of the nation's largest residential apartment Lessors, including Defendant Mid-America Apartment Communities, Inc., used their own assessments of how best to compete against other Lessor apartment owners. Prior

1

to 2016, apartment owner Lessors, including Defendant Mid-America Apartment Communities, Inc., typically priced their apartment rental units competitively to get top revenues by maximizing physical occupancy, i.e., maximizing the percentage of multifamily residential leaseholds that were occupied by paying tenants. Apartment owner Lessors had an incentive to lower their prices to attract lessees, such as Plaintiff and Tennessee Class Members, away from competitors, until all available leases were rented or sold. In this manner, market competition drove rental rates to reflect the supply of rental units and tenant lessees' demand. Lessors also independently determined when to put their leases on the market, resulting in unpredictable supply levels – a natural phenomenon in a competitive market. When supply exceeded demand, lessors cut rental prices.

2. As explained by a former industry executive and a primary developer of the software at issue in this action, Donald Davidoff, Lessors face a 'classic prisoners' dilemma." Since residential real estate is a perishable resource (i.e., if a unit is unoccupied for a month, the Lessor can never monetize that lost month of rent), Lessors favored a strategy of keeping "heads in the beds," a term for offering attractive lease pricing to maximize physical occupancy levels in multifamily residential real estate properties. Thus, Davidoff explained, while all Lessors collectively "would be better off limiting their rent (price) reduction," if any Lessor individually "lower(ed) their rents while the others don't, then that (individual Lessor) would outperform" vis-à-vis their competitors. In the absence of assurances that all Lessors would be limiting their rental price reductions, then, the prisoner's dilemma dictated that the prudent course was to reduce price and compete for market share.

3. However, on or about approximately 2016, Defendant and other Lessors replaced their independent rental pricing and supply decisions with collusive behavior. Defendant and its

2

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

co-conspirators agreed to use a common third party that collected competitively sensitive real-time pricing and supply levels from them, and then used that data to make unit-specific pricing and supply decisions for Defendant and its unnamed coconspirators. These parties also agreed to follow these decisions with the understanding that competing Lessors would do the same.

4. That unnamed third party is RealPage, Inc. ('RealPage'). This entity provides software and data analytics to Defendant and competing Lessors. RealPage also serves as the mechanism by which Defendant and Lessors collude and avoid competition, increasing lease prices to Plaintiff and putative Class Members in Tennessee. RealPage openly boasts that its services "balance supply and demand to maximize (Lessors') revenue growth." And that is precisely what RealPage has done, facilitating an agreement among Defendant and participating Lessors not to compete on price, and allowing Defendant and its unnamed co-conspirators to coordinate both pricing and supply through at least two mutually reinforcing mechanisms in furtherance of their agreed purpose of suppressing price competition for multifamily residential real estate leases in the State of Tennessee and elsewhere.

5. First, Defendant and other Lessors in Tennessee "outsource daily pricing and ongoing revenue oversight to RealPage, collapsing separate centers of independent decision-making into one. RealPage collects up-to-the-minute data on the historical and contemporaneous pricing of rental units from participating Lessors. According to RealPage, this data is updated "every time (Lessors) make or change a (lease) renewal offer," spanning over "16 million units," which is a "very large chunk of the total inventory in the country." RealPage standardizes this data to account for differences in characteristics or "class" of the property in question. It then runs this massive dataset through its pricing algorithm, whereby RealPage and its "Pricing Advisors" set prices for Defendant MAA and participating Lessors through application of this common formula.

3

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

RealPage asserts that it sets pricing for participating Lessors' "properties as though we own them ourselves" – i.e., the Defendant and the participating Lessors' cartel replicates market outcomes one would observe if they were a single seller or a monopolist of residential leases.

6.      RealPage Pricing Advisors are central to RealPage, Defendant MAA, and the Lessors' ability to achieve centralized, coordinated prices among Lessors.  RealPage directly employs Pricing Advisors who are assigned to Lessors and integrated into their price setting process. These Advisors are involved in setting baseline rules for how the common algorithm functions, viewing the outputs of the algorithm, finalizing pricing decisions for the Lessors, and providing guidance on adhering to RealPage's price-setting system.  The Pricing Advisors are assigned to groups of competing Lessors operating in a geographic area or city; put another way, multiple competing Lessors are outsourcing their pricing functions to the same common algorithm, with the algorithm's output interpreted by the same individual human being (the Pricing Adviser), mimicking a monopoly outcome.

7.      While these Pricing Advisors are assigned to oversee pricing for a particular group of competing Lessors in a specific geographic area or city, RealPage ensures that their focus and goals remain raising rents across that area or city as a whole as opposed to for Lessors on an individualized basis.  In fact, RealPage directly ties compensation of its Pricing Advisors to whether they have been successful in raising rents across their assigned area or city *overall* – not to their ability to meet revenue goals for their assigned competing Lessors.  Pricing Advisors accordingly aim to raise rental prices across their assigned group of competing Lessors *as well as* the prices of other competing Lessors, assigned to other pricing Advisors, but located in the same area or city.  To accomplish this goal Pricing Advisors routinely coordinate with one another and

4

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

share forward-looking pricing plans, ultimately inflating prices for all competing Lessors within a given region or city and establishing "an artificial floor" for RealPage's provided rental prices.

8.       While Lessors may reject the RealPage pricing through an onerous process, RealPage emphasizes the need for "discipline" among participating Lessors.  To encourage adherence to its common scheme, RealPage explains that for its services to be most effective in increasing rents, Lessors must accept the pricing at least eighty (80%) percent of the time.  RealPage also directly incentivizes each Pricing Advisor, through its compensation structure, to push Lessors to follow RealPage pricing and maintain higher prices across their assigned submarket. These efforts are successful, with Ryan Kimura, a former RealPage executive, explaining that as many as ninety (90) percent (and at least eighty 80%) of prices are accepted by participating Lessors.

9.       A former executive of one of the companies that originally developed the revenue Management software explained that RealPage's pricing decisions were "rarely overwritten." Simply put, and as a representative of Lessor ECI Group, Emily Mask, explains, while "we (Lessors) are all technically competitors," RealPage "helps us (Lessors) work together," "to work with a community pricing strategy, not to work separately."

10.       Second, RealPage allows its Lessors to coordinate supply levels to avoid price competition.  In a competitive market, there are periods where supply exceeds demand, and that in turn puts downward pressure on market rental prices as firms compete to attract lessees.  To avoid the consequences of this normal competition, RealPage provides Lessors with information sufficient to "stagger" lease renewals to avoid oversupply.  Lessors thus held vacant rental units unoccupied for periods of time (rejecting the historical adage to keep the "heads in the beds" to

5

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

ensure that collectively, there is not one period in which the market faces an oversupply of residential real estate properties for lease, keeping prices higher.

11.     By staggering lease renewals to artificially smooth out natural imbalances of supply and demand, RealPage and participating Lessors, including Defendant MAA, also eliminate any incentive to undercut or cheat on the cartel (avoiding a race to the bottom, or the "prisoner's dilemma"). This is the central mantra of RealPage, to sacrifice "physical" occupancy (i.e., to decrease output) in exchange for "economic" occupancy, a term created by RealPage to refer to increasing prices and decreasing physical occupancy levels (output) in the market for residential apartments.

12.   The Defendant's and RealPage's participating Lessors' joint efforts were effective at achieving anticompetitive outcomes: higher rental prices and lower physical occupancy levels (output). RealPage boosts that participating Lessors experience "rental rate improvements, year over year, between 5% and 12% in every market." The CEO of coconspirator Camden, Ric Campo, has said that the net effect of raising rents and 'pushing people out" of the residential real estate leases which they could no longer afford, was "$10 million in income." As discussed below RealPage and participating Lessors have accomplished their goal of pushing up rental prices even under unprecedented market downturns such as the Covid-19 pandemic.

12.     RealPage is proud of its role in the exploding increase in the prices of residential apartment leases. In a marketing video used to attract new Lessors to its organization, a RealPage Vice President, Jay Parsons, discussed the recent and unprecedented price increases for residential leases, as high as 14.50% in some markets. When he went on to ask another RealPage executive: "What role has the (RealPage) software played" in those unprecedented rental price increases, that

6

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

RealPage executive, Andrew Bowen, Vice President of Investor Markets, responded: "I think it's driving it, quite honestly."

13.     In a confidential interview, however, a former RealPage employee who was directly involved in the creation of the original software, has expressed his dismay with the way RealPage has enabled Lessors to collectively raise rents at this rapid pace. This collusive behavior has in turn placed massive pressure on renters' efforts to keep roofs over their heads.  An early developer of RealPage's pricing software reflected that "these optimization systems are really efficient at extracting value and they will push things (as far as they can) until they start to break."

14.     If left unchecked, RealPage and its participating Lessors' cartel (including Defendant MAA) stand to ruin with ever increasing rental rates the multifamily residential real estate lease market and continue to exacerbate the affordable housing crisis in Tennessee and in this Nation.  The cartel Plaintiff challenges is unlawful under Tennessee Antitrust Act.  Plaintiff brings this action to recover damages, trebled, as well as injunctive and other appropriate relief on behalf of Tennessee Class Members.

## PARTIES AND UNNAMED CO-CONSPIRATORS

15.      Plaintiff Kelsey Wolf a citizen of the State of Tennessee. Plaintiff Wolf rents a multifamily residential unit in a property managed by Defendant Mid-America Communities, Inc. in Cordova, Tennessee. Plaintiff Wolf has paid higher rental prices directly to Mid-America Communities, Inc., and was damaged by Defendant's violation of the Tennessee Antitrust Act during the Class Period.

16.     Defendant Mid-America Apartment Communities, Inc. ("Defendant MAA") is a Tennessee Corporation headquartered on 6815 Poplar Avenue, Suite 500, in Germantown, TN. Defendant MAA earns over one billion dollars per year in revenue and employs over 2,400 people.

7

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

17.     The acts alleged against Defendant MAA in this Complaint were authorized, ordered, or one by its officers, agents, employees, or representatives while actively engaged in the management and operation of Defendant MAA's business or affairs.

18.     Various other persons, entities, companies, and corporations not named as a Defendant, including some whose identities are presently unknown (collectively hereinafter referred to as "co-conspirators"), conspired with Defendant MAA in the violations alleged herein and have made statements and performed acts in furtherance of these violations in the State of Tennessee and throughout the United States that had a direct, substantial, and reasonably foreseeable effect on commerce in the State of Tennessee and throughout the United States.

19.     Other entities with which Defendant MAA may have conspired, or who are connected with the unnamed co-conspirators and who are on notice and have knowledge of the facts and claims that may be against them by virtue of allegations in cases filed in various federal courts in the United States, including Case No. 2:22-cv-01712 filed in the Western District of Washington at Seattle, include but are not limited to RealPage, Inc., Greystar Real Estate Partners, LLC, Lincoln Property Co., Cushman & Wakefield, Inc., FPI Management, Inc., RPM Living, LLC, BH Management Services, LLC, Morgan Properties, LLC, Avenues Residential, LLC, Bozzuto Management Company, Avalonbay Communities, Inc., Highmark Residential, LLC, Equity Residential, The Irvine Company, LLC, Essex Property Trust, Inc., ZRS Management, LLC, Camden Property Trust, UDR, Inc., Conam Management Corporation, Cortland Partners, LLC, Thrive Communities Management, LLC, Security Properties Inc., CWS Apartment Homes, LCC, Prometheus Real Estate Group, Inc., Sares Regis Group Operating, Inc., and Mission Rock Residential, LLC.

## JURISDICTION AND VENUE

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

20.    This Court has proper jurisdiction over this matter in that Defendant MAA has transacted and conducted business in the State of Tennessee and in this judicial district throughout the Class Period, and its actions constitute commerce and affect commerce in the State of Tennessee. Defendant MAA has its headquarters and principal place of business at 6815 Poplar Avenue, Suite 500, Germantown, TN.  Defendant MAA has operated and managed residential real estate properties in the State of Tennessee during the Class Period. Defendant had continuous and systematic contacts with the State of Tennessee, and specifically in Shelby County, Tennessee. This Court has proper jurisdiction pursuant to Tenn. Code Ann. § 20-2-201.

21.    The conspiracy and other actions alleged in this Complaint have caused injury to Plaintiff and Class Members in the State of Tennessee. Defendant knew or should have known that its actions would adversely affect Plaintiff and putative Class Members, and that its actions were in violation of Tennessee law.  Defendant should have reasonably anticipated being brought before Tennessee courts as a result of its conspiracy.  Venue is proper with this Court pursuant to Tenn. Code Ann. § 20-4-101 because Plaintiff's cause of action accrued in Tennessee; Defendant transacted business in Shelby County, Tennessee; and such transactions give rise to Plaintiff's cause of action.

22.    As a result of the sales of residential leases which were sold to Plaintiff and Class Members in the State of Tennessee during the Class Period, Defendant, directly and through its affiliates, or agents, obtained the benefits of the laws of the State of Tennessee.

23.    Plaintiff's and Class Members' state law cause of action asserts no federal question or statute, and therefore does not arise under federal law.  Plaintiff and Class Members assert only violations of the Tennessee Trade Practices Act.  Plaintiff specifically denies any intent to state a

9

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

cause of action arising under the laws of the United States of America, including any claim for injunctive relief available under federal law.

24.     Rental rates for multifamily dwellings in the State of Tennessee can be manipulated by Defendant MAA within the State, outside of it, or both.  Without enforcing antitrust laws in the State of Tennessee, companies that break the law will go unpunished. Defendant MAA knew that commerce in the State of Tennessee and throughout the United States would be adversely affected by implementing its conspiracy and engaging in its illegal conduct.

### RELEVANT MARKET

25.     The relevant product market is the market for the lease of multifamily residential real estate and the relevant geographic market is the United States, including the State of Tennessee.

26.     From the perspective of the consumer, multifamily rental apartment units are not an economic substitute with apartments, condominiums, or homes for purchase because, among other reasons, purchase of real estate requires the ability to make a substantial down payment and to obtain financing.  Additionally, the maintenance costs of owning real estate property may be significant.

27.     From the consumers' viewpoint, single-family real estate is not an economic substitute for multifamily residential real estate. For example, single-family properties do not offer amenities and security. In fact, industry participants in the multifamily residential real estate market typically differentiate between multifamily and single-family real estate when discussing customer preferences and market trends, including concerning their disparate respective pricing.

28.     The multifamily residential real estate lease market satisfies the test for market definition used by federal antitrust agencies, widely known as the "SSNIP test." This test asks

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

whether a hypothetical monopolist in a market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SNNIP"), without causing a sufficient number of customers to change to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If the SNNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

29. In this case, the SNNIP test is satisfied, and the market is properly defined. As described herein, pursuant to the Defendant's agreement with its unnamed co-conspirators not to compete on rental prices, they are able to increase "year over year, between 5% and 12% in every market," yet those increases have not driven enough renters out of the market such that the SSNIP has become unprofitable to Lessors.

30. Before RealPage facilitated collusion among Lessors, Lessors acting independently followed a policy to keep "heads in the beds." This simply meant that the market was functioning competitively. Lessors, concerned that every day a property remained unrented was a lost opportunity to earn revenue for that day, offered sufficiently attractive pricing to maintain maximum "physical occupancy" across their units. This could come in the form of reduced rental prices and sometimes other price concessions, such as "first month free" offers.

31. The "heads in the beds" strategy also minimized turnover expenses, as there were hard costs associated with finding and evaluating a replacement tenant as well as lost revenue opportunities if a unit sat vacant between tenants.

32. The senior vice president of property management at unnamed coconspirator the Morgan Group, David Hannan, described the market before RealPage's arrival, stating that a "generation" of Lessors "grew up worshipping the occupancy gods. We learned that if you were

11

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

not 95 percent-plus occupied, the asset was failing." Prior to 2016, Lessors accomplished their goals of "worshipping the occupancy gods' and 'keeping heads in the beds" through "manual pricing," a term Lessors use to refer to uncoordinated, independent pricing. This led Lessors to maximize physical occupancy levels (output) by offering sufficiently low pricing to attract tenants to sign new, or existing, leases. In economics, this is referred to as a market share over price strategy, and it is a common defining characteristic of a market that is functioning competitively.

33. Following RealPage' s entry into the market, its participating Lessors swiftly, and concertedly, shifted from the previous competitive market share over pricing strategy to a new collusive price over volume strategy. A price over volume strategy is a hallmark of pricing in a cartelized market.

34. RealPage and its participating Lessors, including Defendant MAA, have adopted a philosophy of maximizing economic occupancy, that is, increasing prices notwithstanding market conditions and tolerating any reduced physical occupancy that might create. Since Lessors of residential multifamily real estate properties (a finite resource) face a natural prisoner's dilemma, maximizing economic occupancy is only in a firm's economic self-interest if many Lessors collectively follow suit. As Davidoff--a primary developer of what is now RealPage's revenue management software—stated, while all Lessors "would be better off limiting their rent (price) reductions," if any Lessor 'lowered their rents while others don'ts, then that (Lessor) would outperform." The easiest way to solve the prisoner's dilemma, such that it would be profit maximizing to maintain high prices, would be if Lessors had mutual assurances that other Lessors would not compete with them on price.

35. RealPage and its participating Lessors, including Defendant MAA, have provided one another with such mutual assurances, agreeing among themselves not to compete on price for

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

the sale of multifamily residential real estate leases. They have accomplished their agreement through two mutually reinforcing mechanisms. First, participating Lessors have agreed to set prices using RealPage's coordinated algorithmic pricing. Second, participating Lessors have agreed to stagger their lease renewal dates through RealPage, to avoid (otherwise naturally occurring) oversupplies in rental properties. RealPage's coordinated algorithmic pricing allows its participating Lessors, in RealPage's words to 'outsource (their) daily pricing and ongoing revenue oversight" to RealPage, with RealPage pricing for its participating Lessors' "properties as if we (RealPage) own them ourselves" – that is, as if RealPage and its participating Lessors were operating as a single seller or monopolist.

36.     Participating Lessors, including Defendant MAA, agree to adhere to RealPage's coordinated algorithmic pricing, often referring to such adherence a pricing "courage," or more frequently, as pricing "discipline." These competing entities also agree to provide RealPage with their real-time private and competitively sensitive confidential data on their multifamily residential real estate leases.

37.     RealPage states that this confidential data includes over "16 million units" which is a "very large chunk of the total inventory in the country." RealPage standardized this collected data to account for differences in the characteristics or "class" of the property in question. RealPage then runs this dataset through its pricing algorithm, whereby RealPage and its Pricing Advisors establish prices for its participating Lessors, including Defendant MAA, through application of a common formula for the common dataset.

38.     RealPage's Pricing Advisors ensure coordination in price setting rental rates between its Lessors. Each Pricing Advisor is assigned to a group of competing Lessors in each geographic area or city, and tasks them with integrating themselves into each of their assigned

13

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

competing Lessor's price setting processes.  It is problematic enough that groups of competing Lessors in a market are outsourcing their price-setting function using the same algorithm and the same Pricing Advisor.  But each of RealPage's Pricing Advisors also coordinate price increases with other Pricing Advisors that are assigned to different groups of competing Lessors in the same region or city, and they are incentivized to do because a percentage of each Pricing Advisor's compensation is linked to the amount that price increases in rental rates across their assigned geographic area or city – not to their ability to meet revenue goals for the individual Lessors they are advising. Price Advisors work to raise prices across their assigned group of competing Lessors in the same area or city on a forward-looking basis which inflates prices across the area or city. A former industry executive closely involved in RealPage's pricing software explained that once there are centralized Pricing Advisors directing the helm, the software acts as "a deterministic tool" wherein "if you put in the same value you get the same results" across Lessors.

39.     Every morning, each Pricing Advisor reviews the results of the pricing algorithm, as well as information from fellow Pricing Advisors, in order to direct prices for each of their assigned competing Lessors, increasing rental prices across Lessors in an area or city, and establishing "an artificial floor" for rental prices in that area or city.  The Pricing Advisors then provide their assigned competing Lessors with pricing for the day.

40.     Lessors generally must communicate to their assigned Pricing Advisor that they have "accepted" or "confirm(ed)" the "approved pricing" within a specified time frame.  If Lessors wish to diverge from the "approved pricing" they must submit detailed reasoning (for example, the rental unit in question had structural or flood damage that the algorithm was unaware of/did not account for) justifying their price reduction. A former RealPage employee who provided training for the software systems explained in her experience, overrides had to be approved by

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

RealPage, while another former employee said "there's got to be a good reason indicated" for the override to be approved, such as "circumstances outside what the model is aware of."

41. Daily calls between the Pricing Advisors and Lessors' employees with pricing responsibility were encouraged. RealPage also directly incentivizes each Pricing Advisor, through its compensation structure, to push Lessors to follow RealPage pricing and maintain higher prices across their assigned area or city. Former employees have said RealPage discouraged overrides and strongly encouraged Lessors to follow the company's pricing model; another former employee said Pricing Advisors had no discretion to override pricing determined by RealPage and that Lessors had to adhere to those pricing decisions.

42. If disagreements arose between Pricing Advisors and a Lessor, the Lessor's management was called in to resolve the dispute and asked to justify with specific reasons for departing from the model. Importantly, this very same Pricing Advisor that is resolving the dispute about recommended pricing is also setting pricing for competitors of the Lessor in question as well as communicating with other Pricing Advisors who are setting pricing for still more competing Lessors in a given area or city, with the aim of increasing pricing across the area or city as a whole (because the Pricing Advisor's compensation is set by how a particular area or city performs as a whole, rather than how individual Lessors to which an Advisor is assigned performed).

43. RealPage emphasizes the need for pricing discipline among participating Lessors and urges them that for its coordinated algorithm pricing to be the most successful in increasing rents, participating Lessors must adopt RealPage's pricing at least 80% of the time. As one example of such encouragement, Jeffry Roper, RealPage's primary architect, publicly described the problem as: "If You have idiots undervaluing (setting prices independently), it costs the whole system." And an Executive Vice Chairman for unnamed coconspirator Lessor Camden, Keith

15

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

Oden, explained that "it's not like we sit around and do what we think we feel like we should be doing for rental increases. It's all driven by the metrics within (the algorithm) and we take those recommendations."

44.     Ryan Kimura, a former RealPage executive, reported these instructions are successful, with as many as 90% (and at least 80%) of RealPage's pricing being adopted. As one Lessor explained to media outlet ProPublica, RealPage's coordinated algorithmic pricing required counterintuitive changes in their business practices "because (upon adopting RealPage's coordination of pricing) we weren't offering concessions nor were we able to negotiate pricing" like they previously had. This Lessor went on to explain that RealPage "maximize(s) rents but you have to be willing to strictly follow it," and, as a result, "we rarely make any overrides to the recommendations" provided by RealPage. Davidoff, a primary developer of the software described RealPage as bring "discipline" and "courage o pricing."

45.     A former RealPage Senior Operations Analyst explained that the company "definitely discouraged" overrides and "essentially encourage(d) you to take the offering that the system projected and use that." He explained that "[t]he goal is and was to maximize the returns of the property management companies. And how do You do that? You do that by raising rents. It was very clear that that's the way things were structured. That was the name of the game." For that reason, overrides were not recommended.

46.     Staggering lease renewals to avoid periods of oversupply that would persist absent concerted action by would-be rival Lessors provided RealPage another means to offer coordinated guidance to the Lessors. Emily Mask, a representative of the ECI Group, explained that using RealPage, Lessors are "now able to stagger lease expirations throughout the month, effectively cutting down frictional vacancy loss we well as concessions" on price. Mask went on to say that

16

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

by staggering lease renewals, Lessors have "leveled the lease expirations throughout the year to better match the historical demand for each community, thus positioning us (the Lessors) for even higher rent growth."

47.     A former Business Manager for unnamed coconspirator Pinnacle Property Management Services LLC, a subsidiary of unnamed coconspirator C & W explained that RealPage helped Pinnacle avoid a situation where there were a significant number of units renewing at the same time. RealPage "would recommend a 10-month lease instead of a 12-month lease on certain people (to avoid simultaneous renewals," he said. "Or a 13-month lease – to try to get it to that next month [so that] instead of having 15 renewals, you would end up with 10 renewals."  Another RealPage employee explained that once lease expiration limits for a certain time were reached, the RealPage "system will not allow You to create another lease to expire during the time unless you override" the system.

48.     Lessors have publicly admitted that RealPage has allowed them to maintain higher prices in concert, with confidence that they can avoid price cutting and the prisoner' dilemma. One representative of unnamed coconspirator ECI Group, Mask, commented that while "we are all technically competitors," that Lessors' common adoption of and adherence to RealPage's software "helps us work together," "to work with a community in pricing strategies, not to work separately." A representative of another unnamed coconspirator, Stephen Adams, Senior Vice President of Asset Management at LaSalle Investment Management, explained that by "outsourcing" pricing functions to RealPage, prices are set by RealPage's "multifamily experts . . . who essentially act like an extension of our team." Another representative (the CEO) of unnamed coconspirator, Camden, explained that in following the price over volume, or with the maximizing economic capacity, strategy, they found "that driving our turnover rate up actually captured additional

17

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

revenue." Campo continued: "The net effect of driving revenue and pushing people out was $10 million in income." He concluded, "I think that shows that keeping the heads in the beds above all else is not always the best strategy." But given the prisoner's dilemma faced by Lessors, rejecting that competitive strategy is only in a Lessor's economic self-interest if they have assurances that they will not be significantly undercut by competing Lessors. RealPage provides a mechanism through which Lessors coordinate their prices and achieve that common understanding.

49.     RealPage also encourages direct coordination among competing Lessors to increase the cartel's efficacy and Lessors' adherence to the scheme. Specifically, RealPage directs Lessors to contact competitors directly to confirm current prices. This revelation is particularly stark, not just because it allows the Lessors to monitor and ensure compliance with the coordinated algorithmic pricing, but because RealPage itself has admitted that such a practice is tantamount to collusion.

50.     For example, a former leasing manager of unnamed coconspirator CONAM explained that, in following RealPage's instruction' to routinely collect current, non-public rental prices from their competitors, several coconspirators, including unnamed coconspirator Irvine, participated in an email chain in which leasing managers shared non-public information about rental unit pricing on a regular basis former leasing Consultant from Defendant MAA described that, to assist in collecting competitors' pricing data, RealPage even provided a form containing the names of competitors to call and the information to obtain. She remembered that she called competing properties every Tuesday to obtain the latest pricing information, or "the price for that day," and would use the RealPage form to guide those calls: "You kind of just go down the list and fill out the blanks."

51.     RealPage has defended its conduct claiming that "typically" Lessors engaged in

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

"manual pricing" (a term of art that RealPage uses for any pricing that is not recommended by its revenue management systems) by conducting phone surveys to check competitors' rents, which RealPage has claimed publicly could result in anticompetitive behavior. RealPage claims its offerings thus "help to eliminate the risk of collusion that could occur with manual pricing" and the Lessor-to-Lessor communication RealPage claims would occur. But that Lessor-to-Lessor communication on pricing is not proscribed by RealPage, it is encouraged by RealPage, despite RealPage itself recognizing its collusive nature.

52.     Industry participants, including RealPage, admit that its coordinated algorithmic pricing has caused higher prices and reduced output. RealPage's Vice President of Investor Markets, Andrew Bowen, has publicly stated: "I think it's [RealPage's coordinated algorithmic pricing] driving it [higher prices for residential real estate leases], quite honestly."

53.     RealPage advertises that those who participate with algorithmic pricing see "[r]ental rate improvements, year over year, between 5% to 12% in every market, the ability to "outperform the market by up to 5%" and "drive up to an additional 150-200 basis points of hidden yield" that would not otherwise be attainable to a Lessor utilizing independent pricing, rather than coordinated pricing. RealPage refers to independent competitive pricing as "manual pricing." It claims to "outperform manual pricing" by 7% a year. That is, the Defendant's and its unnamed co-conspirators' succeed in increasing prices above competitive levels by 7 percent each year.

54.     To conclude that these price increases would be economically irrational against each coconspirators independent economic self-interest if acting alone (that is, absent assurances that other coconspirators would also be exercising pricing "discipline"), or that price increases would be unachievable absent the implementation of coordinated algorithmic pricing by RealPage' participating Lessors, one need no further admissions of RealPage and its participating Lessors,

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

who openly extol the value of cartelization (higher prices, lower output) to each other.

55.     In a testimonial video on RealPage's web site, the Director of Revenue Management of JVM Realty, Kortney Balas, explained that "the beauty of using [RealPage's pricing] is that it pushes [Lessors] to go places that you wouldn't have gone on your own if your weren't using it."

56.     The CEO of coconspirator Equity, David Neithercut, stated at an industry conference that it "raised rents hundreds of dollars," following RealPage's coordinated pricing algorithm strategy and noted that Equity would not have had "the courage to push [rents] as aggressively as '[the RealPage pricing] program has."

57.     Keith Oden, President and COO of unnamed coconspirator Camden, admitted that, in the natural state of play, it is simply "not in [a Lessor's] DNA to raise pricing $450 to $200 per unit on a lease turn," but following RealPage's coordinated algorithmic pricing allowed Camden and others to do what, independently, they would not.

58.     RealPage itself concedes that the price levels its Lessors achieved could not have been obtained independently stating: We believe in overseeing properties as though we own them ourselves.  We believe we can deliver better results for you than you would otherwise be able to achieve." In other words, RealPage concedes that its coordinated algorithmic pricing allows Defendant MAA and its coconspirators to obtain the same results as a single seller or monopolist --an outcome Lessors "would not otherwise be able to achieve" without RealPage's pricing and assurances of Lessors' discipline to that pricing.

59.     The Covid-19 pandemic illustrates the success of RealPage's coordinated pricing strategy. Amy Dreyfus, a RealPage Vice President of Revenue Management, explained that "at the start of Covid, I think a lot of our [Lessors] initial reaction was 'oh I need to start dropping

20

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

rent, I need to start giving [price] concessions" to account for the exodus of renters from major metropolitan areas. But "our [RealPage's] advisory team and the product did a great job" of resisting that natural competitive outcome. Jay Parsons, RealPage's Vice President of Asset Optimization and Deputy Chief Economist, agreed with that assessment, stating "we just saw unbelievable resilience and I would say discipline in pricing through the worst of the downturns … a lot of people thought we'd see severe rent cuts; that just didn't happen." That "resilience" and "discipline" is "unbelievable" precisely because absent assurances that competing Lessors are not going to undercut a coconspirator Lessor on price, such discipline is against the norm

60. The market for the sale of multifamily real estate leases from Lessors to lessees (i.e., owners to renters) is characterized by numerous features, referred to as "plus factor," that render the industry susceptible to collusive behavior, such that the formation, maintenance and efficacy of a monopoly cartel is more likely. These include (1) high barriers to entry, (2) high barriers to exit, (3) market concentration, (4) inelastic consumer demand, (5) relative fungibility of residential real estate leases, (6) exchanges of competitively sensitive information among horizontal competitors, and (7) numerous opportunities to collude at trade associations and RealPage functions.

61. First, multifamily residential real estate properties owners and operators face significant entry barriers. These include the high cost of acquiring property, establishing a property management infrastructure, and ongoing costs of building maintenance and regulatory compliance. Even small multifamily rental properties cost millions of dollars to build, own and manage and take several years to develop. Thus, new entrants into the residential real estate leasing market are unlikely to discipline cartel pricing.

62. Second, lessees of multifamily residential real estate properties face high exit

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

barriers. Renters typically incur substantial cost and inconvenience when moving, and where price escalation is occurring in broad geographic areas, they might not have a lower priced option in reasonable proximity to where they currently live or work. As such, renters/lessees cannot easily turn to alternative Lessors of multifamily residential real estate properties to counter cartel pricing.

63. Third, the demand for multifamily residential real estate property leases is relatively inelastic. The only realistic alternative to renting is buying, and for most renters, that is not an option financially or logistically. Thus, no reasonable substitutes exist to discipline cartel pricing.

64. Fourth, the market for residential real estate property leases is highly concentrated. Most major metropolitan areas are dominated by relatively few sellers, with many large corporations like unnamed coconspirator Greystar having substantial presences in metropolitan areas throughout the United States.

65. Fifth, multifamily real estate properties are relatively fungible, particularly within classes of property. That is, when controlling for certain high-level characteristics of properties – such as the number of bedrooms and bathrooms, amenities, location, or the age of the building—properties within those classes are relatively fungible. Lessors have explained that RealPage's pricing software "is correctly looking at 'like' competitor properties" and 'truly comparing apples to apples' as it relates to competitor apartment pricing."

66. Sixth, RealPage's participating Lessors, directly and using RealPage as a conduit, share competitively sensitive information with one another. In addition to its price-setting and lease renewal-staggering services, RealPage collects non-public, confidential data on multifamily residential real estate properties and creates benchmarking reports that allow for quick comparisons of a Lessor's performance on occupancy and price for similar property classes vis-à-vis the industry. This function could not be recreated using any public, non-competitively sensitive

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

sources as the advertised rates for residential real estate leases typically diverge from the actual rates.

67.    Seventh, RealPage and its participating Lessors have ample opportunities to collude.

68.    Lessors have been involved in the development of RealPage's pricing software from the inception. The original forms of this software were initially developed by companies that were partially owned and controlled by Lessors, including unnamed coconspirators Camden and Equity. A former executive of one the companies that developed the original software, confidentially explained that the company included Lessors in a "strategic customer council' that was "very involved in setting the strategic functionality" of the software. For example, the strategic customer council "advocated" for inclusion of "lease expiration management" – a component of the software that adjusts pricing to increase prices for leases that would expire in time of higher overall supply, thereby allowing Lessors to coordinate supply levels and avoid competition.

69.    Following RealPage's acquisition of the software, RealPage and participating Lessors continue to routinely interact with one another, share information, and collaborate on the development of RealPage's price setting mechanisms behind closed doors. As just one example, RealPage operates a private RealPage user Group Forum, an association of some thousand participating Lessors, which, according to RealPage, aims "to improve communications between RealPage and the user [Lessor] community," while "promot[ing] communication between users [Lessors]" themselves. Within this Forum is an "idea Exchange" where Lessors submit their own recommendations for changes or improvements to RealPage's offerings, as well as provide comments on proposed changes that RealPage is considering implementing to its software

23

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

offerings.  As another example, RealPage organizes certain in-person events and collaboration among participating Lessors.  It invites some to serve on a "Steering Committee," which coordinates with certain subcommittees of the RealPage User Group Forum to ascertain Lessors' suggestions for its software offerings and with the explicit instruction to consider "the mutual benefit of all users."  RealPage also organizes a marquee annual, multi-day event called "RealWorld," where Lessors gather along with approved partners and executives from RealPage to network, exchange insights into key initiatives in the industry, and learn best practices for using RealPage tools.  Over the past five years, those conferences have been held in Las Vegas, NV, Nashville, TN, Orlando, FL, and virtually during the Covid-19 pandemic.

70.    RealPage has also invited Lessors to attend periodic "summits" to discuss its pricing software, covering topics that include (1) "Competitive Rent Analysis" or "[m]ethods of establishing and maintaining amenity-based prices for reach unit and floor plan, factoring in comparable peer pricing," (2) "Supply Forecasts" and "Demand Forecasts," as well as (3) RealPage's "Pricing Engine," or "[m]ethods to price units in real time based on statistically validated price elasticity models."

71.    Finally, industry trade associations offer RealPage and participating Lessors additional opportunities to meet and conspire.  As a example, the National Multifamily Housing Council ("NMHC"), which advertises itself as "the place where leaders of the apartment industry come together to guide their future success," holds several events every year, including in person "Apartment Strategy Conference," an "Annual Meeting," a "Fall Meeting," hosted in cities including San Diego, CA, Las Vegas NV, and Washington, D.C.   NMHC counts among its "Chair's Circle Sponsors" RealPage, Greystar, and more participating Lessors.  NMHC "tracks market conditions through its member surveys as well as data from provider partners," "Rent

24

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

Change – New Leases," and "Rent Change – Renewals."

72.     Nearly fifty additional national and regional trade associations (or their local chapters) facilitate the business of the residential real estate cartel, in the same way as NMHC provides venues for RealPage and its participating Lessors to meet and further their cartel's goals. National trade associations include: Institute of Real Estate Management, (2) National Apartment Association, (3) National Association of Residential Property Managers, (4) Pension and Real Estte Association, and (5) Urban Land Institute.  There are also regional associations working in Tennessee.

## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action on behalf of Herself and all others similarly situated pursuant to Tennessee Rules of Civil Procedure 23.01 as a representative of the Tennessee class which is defined as follows:

> All persons and entities in the State of Tennessee that are direct purchasers of multifamily residential real estate leases from Defendant MAA or from a division, subsidiary, predecessor, agent, or affiliate of Defendant MAA, at any time during the period of October, 2016 to Present or until the Defendant MAA's unlawful conduct and its anticompetitive effects cease to exist.

74.     The Tennessee Class is so numerous that joinder of all members is impracticable. There are thousands of putative Class members located throughout the State of Tennessee.

75.     Plaintiff's claims are typical of those in the Tennessee Class.

76.     Plaintiff's and all members of the Tennessee Class were injured by the same unlawful conduct, which resulted in all of them paying more for multifamily residential real estate leases than they would have in a competitive market.

77.     Plaintiff will fairly and adequately protect and represent the interests of the Tennessee Class.  The interests of the Plaintiff are not antagonistic to the Tennessee Class.

25

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

78. Questions of law and fact common to the members of the Tennessee Class will predominate over questions, if any, that may be individual to individual class members, since the Defendant has acted and refused to act on grounds generally applicable to the Tennessee Class.

79. Questions of law and fact common to the Tennessee Class include;

  a. Whether Defendant MAA has entered into a formal or informal contract, combination, conspiracy, or common understanding to artificially inflate price and/or artificially suppress the supply of multifamily residential real estate leases in Tennessee from competitive levels;

  b. If Defendant entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has artificially inflated prices and/or artificially suppressed supply of multifamily residential real estate leases from competitive levels;

  c. The proper measure of damages; and

  d. The appropriate injunctive relief to remedy the anticompetitive effects of the challenged conduct in the future.

80. Plaintiff is represented by counsel experienced in the prosecution of complex antitrust class actions.

81. Class action treatment is the superior method of the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining damages and injunctive relief for claims which might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## COUNT ONE – VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

82.     Beginning at least as early as October, 2016, and continuing thereafter through the Present date, the exact dates being unknown to Plaintiff, Defendant MAA and its unnamed co-conspirators entered into and engaged in illegal arrangements, contracts, agreements, and a combination and conspiracy in restraint of trade and commerce as alleged herein.  Defendant's arrangements, contracts, agreements, and combination and conspiracy lessened, or tended to lessen, full and free competition and restrained trade and commerce in the State of Tennessee in violation of Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101, *et seq*.

83.     The arrangements, contracts, agreements, and combination and conspiracy alleged herein consisted of a continuing agreement, understanding and concert of action among the Defendant MAA and its unnamed co-conspirators, the substantial terms of which included, but were not limited to, the following:

(a)     To agree to arrangements, contracts, agreements, and combination and conspiracy among themselves made with a view to lessen, or which tended to lessen, full and free competition in the sale and supply of residential real estate leases in the United States and in the State of Tennessee;

(b)     To agree to arrangements, contracts, agreements, and combination and conspiracy among themselves which tended to increase, advance, or control the market prices and supply of residential real estate leases in the United States and in the State of Tennessee;

(c)     To agree to arrangements, contracts, agreements, and combination and conspiracy among themselves which tended to increase, advance, or control the market prices and supply of residential real estate leases by agreeing to

27

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

adopt RealPage's algorithmic formula for setting residential real estate rental rates and to stagger lease renewal dates pursuant to RealPage guidelines in the United States and in the State of Tennessee; and

(d) To affirmatively conceal the existence of their illegal understanding and agreement.

84. For the purpose of forming and effectuating the aforesaid arrangements, contracts, agreements, combination and conspiracy, the Defendant MAA and its unnamed co-conspirators -- including, in particular, officers and employees of defendant's' and its unnamed coconspirators' affiliates -- participated in secret e-mails, telephone conversations and discussions in the United States in which prices, supply, and price increases of residential real estate properties, as well as methods to conceal defendant's unlawful agreements, were discussed and agreed upon.

## EFFECTS

85. Defendant's MAA's aforesaid arrangements, contracts, agreements, combination, and conspiracy, which were made with a view to lessen, or which tended to lessen, full and free competition, or which tended to advance or control the market prices and supply of residential real estate leases and property, had the following effects on Plaintiff and members of the direct Tennessee residential class, among others:

(a) Prices charged by Defendant MAA and its co-conspirators for residential real estate leases were increased, advanced, or controlled at artificially high and non-competitive levels;

28

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

(b)     Full and free competition in the market prices and supply of residential real estate leases in the United States and in the State of Tennessee was lessened, controlled, or restrained;

(c)     The artificially inflated market prices for residential real estate leases were passed on to Plaintiff and members of the Tennessee class; and

(d)     Plaintiff and members of the Tennessee class, as direct purchasers, have been deprived of the benefits of full and free competition and were damaged in their property or business by having paid more for residential real estate leases than they would have paid in the absence of Defendant's and its coconspirators' unlawful arrangements, contracts, agreements, combination and conspiracy.

FRAUDULENT CONCEALMENT

86.     Plaintiff and members of the Tennessee class had no knowledge that the Defendant MAA and its co-conspirators were violating the Tennessee Trade Practices Act as alleged herein, or of any facts which might have led to the discovery thereof, until shortly before filing this Petition for Damages.  Plaintiff and members of the Tennessee class could not have discovered any of the violations at an earlier time prior to this date by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by Defendant MAA and its co-conspirators to avoid detection of and fraudulently to conceal such violations.  Moreover, Plaintiff and members of the Tennessee class were not aware of any issue regarding the prices of residential real estate leases or their supply due to the false statements and misrepresentations by Defendant MAA and its co-conspirators that their prices for residential real estate leases and supply were very competitive and independently determined.  Plaintiff and members of the Tennessee class had no

29

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

actual or imputed knowledge of Defendant MAA's and its unnamed co-conspirators' arrangements, contracts, agreements, combination and conspiracy until shortly before filing this Complaint for Damages. Plaintiff only learned of defendants' wrongful conduct shortly before the filing of this Complaint for Damages.

87. At all relevant times, Defendant MAA and its co-conspirators affirmatively concealed the existence of their illegal arrangements, contracts, agreements, combination, and conspiracy and thereby tolled the statute of limitations. Plaintiff and members of the Tennessee class did not discover and could not have discovered Defendant MAA's unlawful conduct at an earlier date by the exercise of due diligence because Defendant and its co-conspirators affirmatively and fraudulently concealed the existence of their arrangements, contracts, agreements, combination and conspiracy from Plaintiff and members of the Tennessee class by various acts, including the following:

(a) Defendant MAA and its co-conspirators conducted private, secret e-mails, telephone conversations and discussions in the United States in order to confine knowledge of their unlawful arrangements, contracts, agreements, combination, and conspiracy to a discrete group of individuals;

(b) Defendant MAA and its co-conspirators secretly coordinated by telephone the day-to-day conduct of the conspiracy, such as decisions regarding prices and supply for residential real estate leases;

(c) Defendant's executives routinely and consistently destroyed records and notes of their unlawful e-mails, telephone conversations, and discussions to conceal their illegal conduct; and

30

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

(d)     Defendant and its co-conspirators falsely and fraudulently represented that their prices and supply of residential real estate leases were honest, competitive, and independently determined.

## DAMAGES

88.     During the relevant period of the antitrust violations by Defendant MAA and its unnamed co-conspirators, Plaintiff and members of the Tennessee class directly purchased residential real estate leases, and by reason of the violations alleged herein, paid more for residential real estate leases than they would have paid in the absence of such antitrust violations. As a result, Plaintiff and members of the Tennessee class have been injured.  Plaintiff and members of the Tennessee class are seeking damages under the full consideration damage remedy of Trade Practices Act § 47-25-106 for the relevant period.  Damages for Plaintiff and members of the Tennessee class are presently undetermined but, upon information and belief, do not individually exceed $75,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the Tennessee Class pray:

(a)     That the Court determine and certify a Tennessee Class under Tennessee Rule of Civil Procedure 23.02, as defined above, determine that Plaintiff is an adequate and appropriate representative of the Tennessee Class, and order that reasonable notice of this action be given to the Tennessee Class;

(b)     That the alleged arrangements, contracts, agreements, and combination and conspiracy among the Defendant and its unnamed co-conspirators be adjudged and decreed to be in violation of Tennessee Trade Practices Act § 47-25-101, *et seq.*;

31

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

(c)     That a judgment be entered against Defendant MAA and in favor of Plaintiff and members of the Tennessee class under Tennessee Trade Practices Act § 47-25-105 for full consideration damages for conduct violating Tennessee Trade Practices Act § 47-25-101, *et seq.*;

(c)     That Defendant MAA its successors, its assignees, its subsidiaries and transferees, and its respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf thereof or in concert therewith, be perpetually enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the previously alleged arrangements, contracts, agreements, combination and conspiracy, understanding or concert of action, and from adopting or following any practice, plan, program or design having a similar purpose or effect in restraining competition in the State of Tennessee in the pricing of residential real estate leases;

(d)     That Plaintiff and member of the Tennessee Class be awarded the necessary costs of bringing suit, including reasonable attorney fees under Tennessee Trade Practices Act; and

(e)     That Plaintiff and members of the Tennessee Class be awarded such other and further relief as this Court may deem necessary and appropriate.

<u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all claims so triable.

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

Dated: June 28, 2024                    Respectfully submitted,

s/Alan G. Crone
Alan G. Crone, TN Bar No. 014285
W. Patrick Crone. TN Bar No. 039578
THE CRONE LAW FIRM, PLC
88 Union Avenue (13th Floor)
Memphis, TN 38103
(901) 737-7740 (voice)
(901) 474-7926 (fax)
acrone@cronelawfirmplc.com
pcrone@cronelawfirmplc.com

Thomas J. H. Brill (Mo 368740)
Law Office of Thomas H. Brill
8012 State Line Road Ste 102
Leawood, Kansas 66208
(913) 677-2004
brillkc@gmail.com

33

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371

## <u>DECLARATION AND VERIFICATION</u>

I, Kelsey Wolf, verify and declare that the facts stated in the forgoing Verified Class Action Complaint are true to the best of my knowledge and belief, and that the Complaint was not made out of levity or by collusion with Defendants but in sincerity and truth for the causes mentioned in the Complaint.

*Kelsey Wolf*
_____
Kelsey Wolf

07 / 01 / 2024
_____
Date

34

Doc ID: 7729128b51a846a435ae2d4956c97fef0f558371


| | |
|---|---|
| **Title** | Kelsey Wolf - Verified Complaint |
| **File name** | Wolf_v._MAA_Class...ied_Complaint.pdf |
| **Document ID** | 7729128b51a846a435ae2d4956c97fef0f558371 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| **SENT** | **06 / 28 / 2024**<br>16:36:44 UTC-5 | Sent for signature to Kelsey Wolf (knwolf39@gmail.com) from jlc@cronelawfirmplc.com<br>IP: 173.166.195.225 |
| **VIEWED** | **07 / 01 / 2024**<br>16:54:32 UTC-5 | Viewed by Kelsey Wolf (knwolf39@gmail.com)<br>IP: 50.237.77.218 |
| **SIGNED** | **07 / 01 / 2024**<br>16:55:13 UTC-5 | Signed by Kelsey Wolf (knwolf39@gmail.com)<br>IP: 50.237.77.218 |
| **COMPLETED** | **07 / 01 / 2024**<br>16:55:13 UTC-5 | The document has been completed. |

Powered by **Dropbox** Sign